**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

VANESSA NIEKAMP,

          Plaintiff,

    **v.**

**OHIO BOARD OF EMBALMERS AND
FUNERAL DIRECTORS,**

          Defendant.

**Case No. 2:18-cv-100**

**Judge Graham**

**Magistrate Judge Vascura**

## OPINION AND ORDER

Plaintiff, Vanessa Niekamp ("Plaintiff"), brings this action against her former employer, the Ohio Board of Embalmers and Funeral Directors ("Defendant" or the "Board"). This matter is before the Court on the Motion for Summary Judgment of Defendant Ohio Board of Embalmers and Funeral Directors. (Def's. Mot. Summ. J., ECF No. 35.) Defendant moves for summary judgment on Plaintiff's claims for 1) gender discrimination related to her alleged constructive discharge; 2) a gender-based hostile work environment; and 3) retaliation under Title VII of the Civil Rights Act of 1964 and Chapter 4112 of the Ohio Revised Code. (*Id.* at 3567.) For the reasons that follow, Defendant's motion is **GRANTED**.

## I.    BACKGROUND

In April 2012, Plaintiff was appointed as Executive Director of the Ohio State Board of Funeral Directors and Embalmers, the state agency charged with licensing and regulating the Ohio funeral industry. Ohio Rev. Code § 4717.02; (Pl.'s Mem. Opp. Def.'s Mot. Summ. J., ECF No. 38 at 3622.) Plaintiff was an "employee" as defined in Ohio Rev. Code § 124.01(F). As Executive Director, Plaintiff served at the pleasure of the Board. Ohio Rev. Code § 4717.03(B).

1

On September 21, 2014, *The Columbus Dispatch* (the "*Dispatch*") featured a front-page news article on prepaid funeral service fraud in Ohio.[1] (ECF No. 30-2 at 1656.) The article criticized Plaintiff for her refusal "to answer any questions about how funeral home inspections are conducted or how . . . 'pre-need' contracts are inspected or audited." (*Id.* at 1657.) The *Dispatch* described the Plaintiff as "unwilling" to respond to the reporter's questions and stated, "[i]t's unclear whether the [Board] is taking steps to prevent fraud or trying to find ways to discover it more quickly." (*Id.*)

The day after the *Dispatch* article was published, Plaintiff received a phone call from then-Governor Kasich's office. (Niekamp Dep. 104, ECF No. 30 at 1356.) Staff member, Jai Chabria, summoned Plaintiff to his office to discuss the *Dispatch* article. (*Id.*) Mr. Chabria was very upset about the article and told Plaintiff to "get control of your board." (*Id.* at 1356, 1359.)

Under Ohio Rev. Code § 4717.02(A), the governor appoints the seven members of the Board. The statute provides that two of the Board's members "shall represent the public." *Id.* Three months after the publication of the *Dispatch* article, Governor Kasich appointed Thomas Taneff ("Taneff") to prioritize the public interest in combating prepaid funeral fraud in Ohio. (Taneff Dep. 8:7-10, 12:13-17, ECF No. 34 at 2981, 2985.) Taneff stated that he was asked to join the Board, "because of the preneed funeral fraud problem in Ohio." (*Id.* at 2981.) Taneff soon focused on the *Dispatch* article and the events leading up to its publication. (*See id.* at 2988.)

**A. Taneff's Investigation of the *Dispatch* Article**

In January 2015, Taneff questioned Plaintiff about her unwillingness to respond to *Dispatch* reporter, Jennifer Smith Richards's ("Richards"), questions concerning the Board's

---

[1] Prepaid or "pre-need" funeral fraud occurs "when a funeral director doesn't appropriately place the money that they received from a client in an insurance trust or annuity to be used by that client for their funeral at the time of their death." (Niekamp Dep. 91:19-23, ECF No. 30 at 1343.)

efforts to address the prepaid funeral services crisis. (Niekamp Dep. 111:12-24, ECF No. 30 at 1363.) Plaintiff stated that she had been cooperative with Richards, and that Richards's article did not accurately reflect the content of their communication. (ECF No. 34 at 2993–94; ECF No. 30 at 1356.) Taneff initially sided with Plaintiff and promptly contacted Richards to discuss the issue. (ECF No. 34 at 2993; ECF No. 30 at 1365.)

On January 9, 2015, Richards forwarded her previous email exchange with Plaintiff to Taneff. (ECF No. 30-4 at 1659.)

As relayed by Richards, an email from Plaintiff to Richards dated September 8, 2014 reads as follows:

> I am unwilling to comment on how our inspectors examine pre-need contracts, or conduct pre-need audits. As far as "scope of pre-need fraud issues", we can provide any document necessary to address a public records request, as we have in the past; but again I am unwilling to comment on the "scope", nor am I sure how you are defining "scope".
>
> Thank you again for your continued interest, and please let us know if you have a request for a public record we can address.

> (*Id.* at 1660.)

On January 14, 2015, Plaintiff provided Taneff with her version of the September 8, 2014 email, which differed remarkably. (*Id.* at 1662.)

Plaintiff's version of the September 8, 2014 email read:

> I am unwilling to comment on how our inspectors examine pre-need contracts, or conduct pre-need audits*, as it could seriously impead [sic] our ability to identify fraud in the future if published.* As far as "scope of pre-need fraud issues", we can provide any document necessary to address a public records request, as we have in the past; *but I may be able to comment on the "scope", but will first need to know* how you are defining "scope".
>
> Thank you again for your continued interest, and please let us know if you have a request for a public record we can address. *I can make myself available, just let me know when.*

> (*Id.* at 1663.) (emphasis added)

Plaintiff denied altering the email. (Niekamp Aff. ¶ 15, ECF No. 30-9 at 1683.) Taneff called Richards and accused her of lying, which Richards adamantly denied. (ECF No. 34 at 2995.) Taneff then spoke with *Dispatch* editor, Alan Miller ("Miller"), who maintained the reporter's innocence and welcomed a subpoena into the *Dispatch's* server to verify the newspaper's position. (*Id.* at 2995–96, 3330.) After speaking with Miller, Taneff was convinced that it was Plaintiff who had altered the email in an effort to make herself appear more responsive to Richards's inquiry. (*Id*. at 3024–26.) Taneff now viewed Plaintiff as "deceptive and dishonest." (Taneff Dep. 184:11–12, ECF No. 34 at 3157.)

Taneff's opinion of Plaintiff's ability to effectively lead the Board quickly deteriorated. (*Id.* at 260:9–15, 3233.)

## B. The 2015 Board Meetings

Plaintiff admits Taneff "critiqued [her] for her alleged lack of action in addressing pre-need funeral fraud." (ECF No. 38 at 3647.) On February 4, 2015, Plaintiff documented a conversation wherein Taneff communicated to her that pre-need fraud should be her top priority, and if he and Plaintiff failed to "do something to address the preneed issue," that their "neck[s] [were] on the line." (ECF No. 34-5 at 3338.) Taneff urged Plaintiff to add pre-need fraud to each meeting agenda. (*Id.*) That same month, Taneff requested an executive session for the next Board meeting to "consider . . . charges or complaints against a public employee." (ECF No. 34-9 at 3358.)

At the March 2015 Board meeting, Taneff moved to enter into executive session per Ohio Revised Code § 121.22(G)(1) to discuss Plaintiff's employment. (ECF No. 30-53 at 1808.) Only one other board member supported Taneff's motion. (*Id.*) The motion failed. (*Id.*)

Taneff's opinion never wavered. Prior to the July 2015 meeting, another Board member claims Taneff told him, "[Plaintiff] needed to go." (Chandler Decl. ¶ 4, ECF No. 38-1 at 3653.)

On July 22, 2015, the Ohio Attorney General's Office drafted a letter to the Board "address[ing] an issue that arose during your July 20, 2015 meeting." (ECF No. 30-56 at 1817). The letter expressed the Ohio Attorney General's concern that Plaintiff, a non-attorney, was engaged in the unauthorized practice of law by negotiating settlement agreements on behalf of the Board. (ECF No. 30-56 at 1817–21.) On July 23, 2015, Plaintiff requested an advisory opinion on her alleged unauthorized practice of law from the Supreme Court of Ohio's Board on the Unauthorized Practice of Law. (ECF No. 34-13 at 3370.) Taneff later questioned whether Plaintiff apprised the Board of her request for an advisory opinion. (ECF No. 34-18 at 3534.) On August 21, 2015, Plaintiff claimed she left Taneff a detailed voice message on July 23, 2015 at 1:55 p.m., informing him of the issue and requesting a call back. (*Id.*)

Taneff never received the message, accused Plaintiff of lying, demanded an investigation into the veracity of her claim, and on August 24, 2015, subpoenaed his phone records. (ECF No. 34-16 at 3469; ECF No. 34-18 at 3532, 3539–42.) Taneff's phone records indicated he did not receive any phone calls from either the Board's office or Plaintiff's personal cell phone during the time specified by Plaintiff. (ECF No. 34-18 at 3539.)

### i. Taneff's Offensive Epithets at Board Meetings

For several months, Taneff addressed fellow Board member, Robert Wasko ("Wasko"), as "peachka" at the beginning and end of every board meeting. (Wasko Dep. 149, ECF No. 32 at 1262.) Taneff's statements to Wasko included, "Hello, peachka. Goodbye, peachka. See you, peachka." Wasko considered Taneff's use of "peachka" to be "endearing," as the two board members shared a mutual friend who also used that term. (Wasko Dep. 148–49, ECF No. 32 at

2462–63.)  Plaintiff was unfamiliar with the term "peachka" and later asked Wasko what it meant. (Am. Compl. ¶¶ 12–13, ECF No. 11 at 581.)  In August 2015, Wasko told Plaintiff that "peachka" was a Macedonian/Eastern European word used to describe female genitalia. (Wasko Dep. 147, ECF No. 32 at 2460.)  Plaintiff soon filed several complaints against Taneff. (Niekamp Dep. 195, ECF No. 30 at 1447.)

### C.  Plaintiff Complains About Taneff

On August 20, 2015, Plaintiff filed a complaint against Taneff with numerous state agencies, including the Ohio Department of Administrative Services ("DAS"). (Niekamp Aff. ¶ 7, ECF No. 30-9 at 1681.)  Plaintiff's email entitled, "Help with Harassment" claimed that Taneff had "systemically threatened, demeaned, and made demands of [her] since joining the board." (ECF No. 34-15 at 3459.)  Plaintiff further relayed that Taneff's "personal malice and attempts to force [her] to quit . . . made [her] fearful and anxious." (*Id.*)  Though Plaintiff provided evidence in support of her claim, she never mentioned Taneff's use of the term "peachka" in her complaint. (*Id.*)

On September 11, 2015, Plaintiff filed an unlawful discrimination charge with the Ohio Civil Rights Commission ("OCRC"). (Niekamp Aff. at ¶ 8, ECF No. 30-9 at 1681; ECF No. 30-64 at 1832.)  Plaintiff stated she was, "continually harassed, intimidated, humiliated and [her] job [was] threatened in an attempt to force [her] to resign due to considerations of [her] sex, female," and that this conduct began after Taneff was appointed to the Board. (ECF No. 30-64 at 1832.)  Plaintiff's OCRC discrimination charge failed to reference Taneff's offensive epithets. (*Id.*)  On September 29, 2015, OCRC transferred Plaintiff's charge of unlawful discrimination to the Equal Employment Opportunity Commission ("EEOC"). (ECF No. 30-81 at 1894.)  Plaintiff admits she

never submitted a written report concerning Taneff's "peachka" comments. (Niekamp Dep. 218:19–21, ECF No. 30 at 1470.)

On September 19, 2015, Stephanie Loucka ("Loucka"), Chief of Human Resources for DAS, emailed her conclusions regarding Plaintiff's August 20, 2015 complaint to the entire Board. (ECF No. 34-14 at 3372.) After reviewing the documents and video evidence provided by Plaintiff, Loucka concluded that her "observations were that Mr. Taneff has high expectations of accountability. Those expectations were displayed in his questions and emails to you as the Executive Director." (*Id.*)

### D. Taneff's Response to Plaintiff's Complaint

Taneff responded to Loucka's email by stating he "was unaware such a complaint was made." (*Id.* at 3373.) Taneff requested a copy of the complaint to "make sure no false or defamatory statements were made by Ms. Niekamp or that she has not committed an abuse of public office." (*Id.*) Loucka treated Taneff's email as a "public records request." (*Id.* at 3374.)

On September 23, 2015, Taneff revisited the *Dispatch* email discrepancy issue and asked then-Board President, Gregory Boyer ("Boyer"), to "conduct a full investigation into what may allegedly be an alteration/falsification of public records by Ms. Niekamp." (ECF No. 34-15 at 3439.) Taneff demanded Boyer "initiate an investigation thru [sic] the Ohio Inspector General, the Ohio Attorney General, and the Franklin County Prosecutor." (*Id.*) Taneff further demanded that the matter be placed on the next Board agenda. (*Id.*) Boyer's internal investigation uncovered no evidence of Plaintiff's wrongdoing. (Boyer Dep. 293, ECF No. 31 at 2203; ECF No. 34-15 at 3411.)

On September 23, 2015, Taneff publicized his request for the Board's investigation into the *Dispatch* email discrepancy issue by forwarding his correspondence with Boyer and several

exhibits to *Dispatch* reporter, Randy Ludlow ("Ludlow"). (ECF No. 34-15 at 3454.) Plaintiff later spoke with Ludlow, who relayed that Taneff made several allegations concerning: 1) the Board's failure to address pre-need funeral fraud; 2) Plaintiff operating outside of the scope of her duties as Executive Director; and 3) Plaintiff's alteration of the *Dispatch* email. (ECF No. 30-74 at 1854.) Plaintiff advised the Board of Taneff's allegations. (*Id.*)

On September 28, 2015, Taneff filed a grievance against Plaintiff with the Supreme Court of Ohio Disciplinary Counsel concerning Plaintiff's potential engagement in the unauthorized practice of law. (ECF No. 34-18 at 3511.) Taneff requested a cease and desist against Plaintiff regarding her negotiation of settlements on behalf of the Board. (*Id.* at 3511–12.) Plaintiff defended her actions by declaring she was acting at the Board's direction per authorization "to act on its behalf by proposing, considering, and coordinating consent/settlement agreements, with final approval, to include signature by the President and Secretary Treasurer." (Am. Compl., Ex. 8, ECF No. 11-8 at 706.)

The Assistant Disciplinary Counsel assigned to Taneff's complaint ultimately found that "While there is no question that the negotiation and preparation of consent and settlement agreements constitutes the practice of law, whether [Plaintiff's] actions on behalf of the Board were improper and the unauthorized practice of law is not as clear." (ECF No. 30-58 at 1824.) As "[Plaintiff] ceased the questionable conduct and because there [was] not substantial, credible evidence that her actions were improper," the Disciplinary Counsel decided not to further pursue the matter. (*Id.* at 1825.)

On September 30, 2015, the Board received notice of Plaintiff's EEOC claim against Taneff. (ECF No. 30-36 at 1733.) That same day, Taneff emailed Boyer "demanding that [Plaintiff] be suspended of all of her Executive Director duties." (ECF No. 30-29 at 1718.) On

October 1, 2015, Plaintiff submitted an affidavit to Boyer stating she believed, "[Taneff] had the motive to change the [*Dispatch* email] messages based on his behavior and harassment toward me, not Richards." (Niekamp Aff. ¶ 12(d), ECF No. 30-9 at 1682.) Plaintiff further contacted the EEOC and added retaliation to her complaint. (ECF No. 30-69 at 1839.)

As Taneff's demand "did not include any reason to show just cause for the removal of [Plaintiff] from her job," no disciplinary action was taken by the Board. (ECF No. 30-36 at 1733.) Plaintiff later withdrew her accusation that Taneff altered the *Dispatch* email. (Niekamp Dep. 120–21, ECF No. 30 at 1372–73.) She admitted to the *Dispatch* that she had "falsely accused" Taneff. (*Id.*)

On October 19, 2015, Taneff once again moved for an "executive session for the sole purpose of the consideration of any of the following matters, to consider the appointment, employment, dismissal, discipline of a public employee or official, or the investigation of charges or complaints against a public employee or official." (ECF No. 34-17 at 3508.) Taneff than motioned to suspend Plaintiff from her executive director duties. (*Id.*) The motion was seconded by another Board member who stated, "I reviewed the exchange of allegations [between Plaintiff and Taneff] and I found them troubling, and I found it astounding—in a bad way—that our executive director admitted that she falsely accused a board member of altering an email, that's a self-indictment." (ECF No. 30-67 at 1835.) Plaintiff nonetheless retained the support of three other Board members, and the motion ultimately failed. (*Id.* at 3509.)

### E. Plaintiff Leaves the Board

The relationship between Plaintiff and Taneff did not improve over the next several months. (Niekamp Dep. 271–72, ECF No. 30 at 1523–24.) In April 2016, Jon Rettig ("Rettig") was appointed to the Board. (Rettig Dep. 34, ECF No. 33 at 2570.) Based on what he read in the

newspaper prior to his appointment, Rettig was "livid . . . that a public member [Taneff] was harassing the executive director." (*Id.* at 2571.) His opinion soon changed. Not long after working with Plaintiff, Rettig shared similar concerns about Plaintiff's ability to effectively combat pre-need funeral fraud, running afoul of the laws governing the Board's conduct, and her overall job performance. (*Id.* at 2584, 2587–96, 2602–05.)

On July 18, 2016, Rettig, motioned for the Board to enter executive session pursuant to Ohio Revised Code § 121.22(G)(1) to consider the "dismissal of a public employee." (ECF No. 11-24 at 940.) There were six Board members present at the July 2016 meeting: Rettig, Taneff, Wasko, Bryan Chandler ("Chandler"), William Wappner ("Wappner"), and William Dodson ("Dodson"). (*Id.* at 937.) The motion carried, and the Board entered executive session. (*Id.*) After the regular meeting of the Board reconvened, Wasko and Chandler announced they were leaving the meeting. (*Id.*) Rettig stated that the meeting was adjourned since there was no longer a quorum. (*Id.*)

After the meeting, Wasko and Chandler met with Plaintiff to inform her that the Board was preparing to terminate her. (Niekamp Dep. 276–77, ECF No. 30 at 1529–30.)

Plaintiff voluntarily resigned on July 22, 2016 stating:

> Unfortunately, the recent actions of a single Board member have turned a collaborative working relationship into an adversarial one, making it impossible to continue to do my work. The baseless accusations, burdensome demands for emails and records, focus on trivial details, and personal antagonism of this Board member have become a distraction from the work of the Board, and leaves me with no choice but to resign.

(ECF No. 11-25 at 943.)

Wasko resigned the same day. (ECF No. 32-5 at 2534.)

On November 8, 2017, the EEOC issued its right to sue letter. (ECF No 30-65.) Plaintiff filed suit shortly thereafter.

## II.     STANDARD OF REVIEW

Defendant has moved for summary judgment on each of Plaintiff's claims under Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt,* 586 F.3d 459, 465 (6th Cir. 2009). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

A district court considering a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum,* 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *see Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Revis,* 489 F.3d at 279–80 (quoting *Anderson,* 477 U.S. at 251–52).

"The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir. 1989). Federal Rule of Civil Procedure 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support [that] assertion by citing to particular parts of materials in

the record." Thus, "the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir. 2001) (internal quotations and citations omitted).

## III. DISCUSSION

### A. Plaintiff's Ohio Law Claims

As an initial matter, the Court notes Defendant's argument that Plaintiff's Ohio law claims under Chapter 4112 of the Ohio Revised Code are barred by the Eleventh Amendment of the United States Constitution. (ECF No. 35 at 3610.) Defendant further argues that Plaintiff has failed to address her Ohio law claims in her Memorandum in Opposition to Defendants' Motion for Summary Judgment and consequently abandons those claims. (ECF No. 39 at 3656.) While Plaintiff does not address her state law claims in great detail, she does reference Chapter 4112 of the Ohio Revised Code in discussing her Title VII claim (ECF No. 38 at 3643), and her statutory reference is sufficient to preserve her claim for purposes of the Court's initial discussion.

Where Plaintiff's deficiency instead lies is in failing to recognize that the Eleventh Amendment prohibits suits against an unconsenting State or one of its agencies or departments brought in federal court by its own citizen or a citizen of another state. *Papasan v. Allain*, 478 U.S. 265, 276 (1986); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This jurisdictional bar exists regardless of the nature of the relief sought. *Pennhurst,* 465 U.S. at 100. Moreover, the State of Ohio has not waived its Eleventh Amendment immunity in federal court. *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999).

Here, Plaintiff asserts gender discrimination, hostile work environment, and retaliation state law claims against the Board, a state agency. Since this Court lacks jurisdiction over these

claims as a matter of law, the Court grants summary judgment to Defendant on Plaintiff's Ohio law claims.

### B. Plaintiff's Hostile Work Environment Claim

Defendant also claims that Plaintiff failed to address her federal hostile work environment claim in her Memorandum in Opposition to Defendants' Motion for Summary Judgment. (ECF No. 39 at 3656.) After reading Plaintiff's memorandum, the Court agrees with Defendant, as Plaintiff only addresses gender discrimination and retaliation in her opposition to Defendant's motion. (ECF No. 38 at 3619.)

The Sixth Circuit's position on a plaintiff's abandonment of a claim is well established. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.,* 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim)). As Plaintiff never addresses Defendant's arguments concerning her federal hostile work environment claim in her response to Defendant's motion for summary judgment, she is deemed to have abandoned that claim. Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's federal hostile work environment claim.

### C. Plaintiff's Constructive Discharge Claim

Plaintiff's Amended Complaint pleads her alleged constructive discharge as a separate claim for relief. (ECF No. 11 at 593.) This Court previously determined that "[c]onstructive

discharge is not a standalone claim; rather, it is a means of proving the adverse action element of a prima facie discrimination case." *Gosbin v. Jefferson Cnty. Comm'rs*, No. 2:14-cv-2640, 2017 U.S. Dist. LEXIS 215293, at *23 (S.D. Ohio Mar. 29, 2017) (citing *Logan v. Denny's, Inc.,* 249 F.3d 558, 567 (6th Cir. 2001)).  Therefore, Plaintiff's constructive discharge claim fails as a matter of law, and summary judgment on this claim is proper.  The Court will, however, construe Plaintiff's purported constructive discharge as the claimed adverse employment action in her Title VII gender discrimination claim.

Plaintiff's remaining claims are gender discrimination and retaliation in violation of Title VII.  The Court will address each in turn.

### D.  Plaintiff's Title VII Gender Discrimination Claim

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).

Where, as here, Plaintiff lacks direct evidence of discriminatory intent, she must establish a *prima facie* case of discrimination by establishing that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or treated less favorably than similarly situated person outside of her protected class. *Tennial v. United Parcel Serv., Inc.,* 840 F.3d 292, 303 (6th Cir. 2016); *Laster v. City of Kalamazoo,* 746 F.3d 714, 727 (6th Cir. 2014); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

If Plaintiff establishes a *prima* facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. If Defendant does so, Plaintiff then must "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Tennial*, 840 F.3d at 303 (internal quotation marks omitted).

The parties agree that Plaintiff is a woman, who possessed the minimum qualifications for her position, and was replaced by a male following her resignation. (ECF No. 35 at 3596; ECF No. 38 at 3644.) At issue in this case is Plaintiff's ability to prove the third element of her discrimination claim, whether she suffered an adverse employment action. An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). "Adverse employment action 'requires an official act of the enterprise, a company act.'" *Laster,* 746 F.3d at 727 (quoting *Ellerth,* 524 U.S. at 762).

A plaintiff may satisfy the element of an adverse employment action by demonstrating that she was constructively discharged. *See Green v. Brennan,* __ U.S. __, 136 S.Ct. 1769, 1776–77 (2016); *Laster,* 746 F.3d at 727; *Kocsis v. Multi–Care Mgmt. Inc.,* 97 F.3d 876, 885 (6th Cir. 1996). "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster,* 746 F.3d at 727 (internal quotation marks omitted).

To demonstrate a constructive discharge, Plaintiff must show that: (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) she actually resigned

or quit. *Id.* at 727–28; *Savage v. Gee,* 665 F.3d 732, 739 (6th Cir. 2012). Here, Plaintiff must show that her working conditions were objectively intolerable, and that the Board deliberately created those conditions to force her resignation. *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018).

### i. Plaintiff's Alleged Intolerable Working Conditions

Courts consider seven factors when determining whether intolerable working conditions exist: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under an unfavorable supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan v. Denny's, Inc.,* 259 F.3d 558, 569 (6th Cir. 2001); *Saroli v. Automation and Modular Components, Inc.,* 405 F.3d 446, 451 (6th Cir. 2005).

To support her constructive discharge claim, Plaintiff contends she suffered months of mistreatment by Taneff, including his efforts to "publicly attack, demean, and humiliate" her. (ECF No. 38 at 3644; Am. Compl. ¶ 72, ECF No. 11 at 591.) Plaintiff also points to Taneff's "baseless charges of wrongdoing and numerous unsuccessful attempts to remove her from her position" as conduct designed to make her workplace intolerable. (*Id.*)

Even viewing these conditions in the light most favorable to Plaintiff, they fall short of demonstrating a constructive discharge. Notably, the Board did not create Plaintiff's claimed intolerable working conditions. As Plaintiff's resignation letter states, it was the "actions of a single Board member [Taneff]" (ECF No. 11-25 at 943), and the record is devoid of evidence that such conduct was ratified by the Board. To the contrary, Plaintiff highlights multiple instances where other Board members took her side during clashes with Taneff. When Taneff demanded

the Board investigate Plaintiff's alleged misconduct, she was absolved from any wrongdoing. When Taneff demanded Plaintiff's immediate suspension, the Board refused to acquiesce. Whatever personal or professional animus Taneff felt towards Plaintiff, the entire Board did not share in his belief.

Plaintiff does identify one action by the Board, namely the investigation of Taneff's allegations concerning her email correspondence with the *Dispatch*. The Sixth Circuit has repeatedly held that, "employers are permitted to investigate their employees for wrongdoing." *Groening*, 884 F.3d at 631. "[A]n internal investigation into suspected wrongdoing by an employee . . . [does not] constitute[] an adverse employment action." *Id.* (quoting *Dendinger v. Ohio,* 207 F. App'x 521, 527 (6th Cir. 2006)). "Though there is an inherent tension between an investigating employer and an investigated employee, that tension does not rise to the level of intolerableness necessary to show constructive discharge." *Id.*

### ii.     The Board's Intent

Plaintiff claims that Taneff's crusade against her culminated in the July 2016 Board meeting where a, "humiliating public termination . . . was inevitable," and "she had no choice but to resign." (ECF No. 38 at 3639–40.) But "[t]o determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Savage,* F.3d at 739 (quoting *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir. 1999)) (internal quotation marks omitted). The employer's intent can be shown by "demonstrating that the employee's resignation was a foreseeable consequence of the employer's actions." *Perry v. Autozoners, LLC*, 954 F. Supp. 2d 599, 616 (W.D. Ky. 2013). While Plaintiff may believe her termination was imminent given her tumultuous history with Taneff, she presents no genuine issue of material fact concerning the Board's intent to force her resignation.

It is undisputed that a termination vote was never taken at the July 2016 meeting. Of the six Board members, Taneff's position was clear. Rettig testified that he would have voted in favor of Plaintiff's termination. (Retting Dep. 149:5–7, ECF No. 33 at 2685.) Wasko and Chandler remained loyal to Plaintiff. Whereas the positions of the remaining two Board members, Wappner and Dodson, remains unknown.

Plaintiff states, "There is no evidence that the Board would not have terminated [her] had she not submitted her resignation letter." (ECF No. 38 at 3644.) But as the Sixth Circuit has cautioned, Plaintiff cannot rely on conclusory statements, subjective beliefs, or intuition to defeat summary judgment. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 519 (6th Cir. 2009) (citing *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1984)).

Plaintiff relies on Wasko's statements that, "The writing was on the wall," and that, "They wanted to embarrass her and walk her out of the building." (Wasko Dep. 111, ECF No. 32.) Plaintiff also uses Chandler's assertion that, "Taneff had the votes." (Chandler Decl. ¶ 16, ECF No. 38-1 at 3655) to support her viewpoint.

Plaintiff's theory is speculative. Ohio Rev. Code § 121.22 prohibits straw votes during executive sessions, and Plaintiff chose not to depose Wappner and Dodson. Moreover, Taneff testified he "had no idea what the other board members would do" concerning Plaintiff's proposed termination. (Taneff Dep. 273:17–20, ECF No. 34 at 3246.) Rettig also testified that he, "[had] no way of knowing" whether the Board had the votes to terminate Plaintiff had she not resigned. (Rettig Dep. 150:18–21, ECF No. 33 at 2686.) Absent testimony from Wappner and Dodson themselves, Plaintiff can only guess the Board's intent or what the final outcome would have been at the July 2016 meeting. Such speculation is insufficient to establish a genuine issue of material fact concerning the Board's intent to force Plaintiff's resignation. Plaintiff therefore cannot sustain

her burden of establishing a prima facie case of discrimination, and summary judgment on this claim is warranted.

### iii. Discriminatory Animus

Even if Plaintiff had met her burden to establish a prima facie case of discrimination under the *McDonnell Douglas* framework, her claim would still not survive summary judgment. While Plaintiff correctly states that under *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 339 (2013), she must "show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives for the decision," there is no genuine issue of material fact that the Board possessed a discriminatory motive. *Id.* at 339.

The record evidence demonstrates that soon after Taneff joined the Board, he voiced concerns about Plaintiff's job performance with respect to addressing pre-need funeral fraud in Ohio. Following the *Dispatch* email inquiry, Taneff developed concerns about Plaintiff's lack of truthfulness and ability to effectively lead the Board. Taneff's concerns later increased after subpoenaing his own phone records for a call Plaintiff claims she made, but Taneff never received. Another Board member questioned Plaintiff's leadership ability after Plaintiff publicly admitted she falsely accused Taneff of altering the *Dispatch* email.

The Ohio Attorney General's Office also cited performance concerns when it determined that Plaintiff may have been acting outside the scope of her duties and engaging in the unauthorized practice of law ("UPL") by negotiating settlement agreements on behalf of the Board. Taneff sought a further determination of the UPL issue and requested that Plaintiff's conduct cease. Early in his tenure, Rettig also formed concerns about Plaintiff's job performance. In short, the record is replete with evidence demonstrating that the Board had legitimate performance concerns and lacked any discriminatory animus towards Plaintiff.

Despite how offensive Plaintiff found Taneff's "peachka" comments to be, the record evidence firmly establishes that these comments were not directed towards her, nor were they directed at another female. Title VII does not require courts to establish a civility code in the workplace. *See Faragher v. City of Baco Raton,* 524 U.S. 775, 788 (1998) (the "standards . . . are sufficiently demanding to ensure that Title VII does not become a 'general civility code'") (citation omitted). Title VII is not violated by "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee." *Id.* Though arguably distasteful, Taneff's comments do not constitute evidence of discriminatory animus against Plaintiff because she is a female.

There is little doubt that personal animosity existed between Plaintiff and Taneff, and that a political dispute soon emerged. But a political dispute among Board members does not automatically translate into discriminatory animus on the basis of gender. However unpleasant Plaintiff's interactions with Taneff may have been, she has failed to direct the Court's attention to any record evidence demonstrating that the Board possessed any discriminatory animus against her. As there remains no genuine issue of material fact concerning discriminatory animus, Defendant is entitled to summary judgment on Plaintiff's Title VII gender discrimination claim.

### E. Retaliation

A Title VII retaliation claim follows the same burden-shifting analysis required for a discrimination claim. *See Laster,* 746 F.3d at 730. Plaintiff must establish a *prima facie* case of retaliation by demonstrating that: (1) she engaged in activity protected by Title VII; (2) her exercise of protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.*

The parties dispute whether Plaintiff was subjected to a materially adverse employment action. (ECF No. 35 at 3602.)

The burden of establishing a materially adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 595-96 (6th Cir. 2007). "To establish the third element of the prima facie Title VII retaliation claim, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laster,* 746 F.3d at 731 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).

Plaintiff claims that within days of learning of her DAS complaint, Taneff escalated a series of allegations against her. (ECF No. 38 at 3649.) Plaintiff points to Taneff's further investigation into the *Dispatch* email issue, his formal written complaint to the Supreme Court of Ohio that Plaintiff had engaged in the unauthorized practice of law and demanding a Board vote concerning whether to terminate Plaintiff at the first Board meeting following Plaintiff's complaint. (*Id.*) Plaintiff maintains that Taneff's "baseless investigations" constituted a series of harassment designed to dissuade her from pursuing her complaints and ultimately forcing her to resign.

Plaintiff's claim amounts to a retaliatory constructive discharge claim where she alleges that the Board, through the actions of Taneff, made her work environment so intolerable that a reasonable employee would have felt compelled to resign. The Court must once again consider both the Board's intent, which can be shown by demonstrating that Plaintiff's resignation was a foreseeable consequence of the Board's actions, and Plaintiff's objective feelings.

In doing so, the Court finds Plaintiff's retaliation claim suffers the same fate as her gender discrimination claim.

While Plaintiff offers evidence that Taneff may have badgered her, the evidence shows nothing more. The Court has already addressed the Board's investigation of Plaintiff's alleged misconduct as not rising to the level of intolerableness necessary to show constructive discharge. What remains is whether the Board was motivated to effectuate Plaintiff's constructive discharge because of her protected activity.

For the Board to be liable, Plaintiff must demonstrate that "protected conduct was a substantial factor in the Board's decision, and not just in the votes of certain members" and assumes "the initial burden of demonstrating that [her] protected conduct motivated the Board to take adverse employment action [against her]." *Scarbrough v. Morgan County Bd. of Educ.,* 470 F.3d 250 (6th Cir. 2006). Here, Plaintiff must point to evidence in the record demonstrating that Taneff tainted the deciding votes with his alleged retaliatory motives. The Court cannot reach this conclusion, as evidence of Taneff's improper influence over the two remaining Board members simply does not exist in the record.

It is undisputed that there was no deciding margin in this case, because a vote was never taken on whether to terminate Plaintiff. Instead, the Court is left to speculate as to what the deciding margin might have been had Wasko and Chandler not dissolved quorum. Even if Plaintiff is correct in asserting that she was about to be terminated, Plaintiff has not pointed to any evidence demonstrating what the motivation of the other two Board members would have been, and thus has not provided any credible evidence from which a jury could find that the deciding margin harbored any retaliatory animus against her. As previously discussed, Plaintiff's intuition or her subjective beliefs simply will not suffice at the summary judgment stage.

As Plaintiff has produced no evidence of what the deciding margin might have been, or that the remaining two Board members were improperly influenced by Taneff, there remains no

genuine issue of material fact that Plaintiff suffered a materially adverse employment action through a retaliatory constructive discharge. Thus, Plaintiff's retaliatory constructive discharge claim fails, and summary judgment is proper here.

## IV.    CONCLUSION

Defendant's motion (ECF No. 35) is therefore **GRANTED**. Accordingly, Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: September 3, 2019